IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| MARK F. SCHULTZ and § <br> LANDMARK CONSOLIDATED, INC. § <br> Plaintiffs, § <br> § <br> VS. § <br> § <br> JOHN ACKER, and, § <br> MIRACLE STRIP HOLDINGS, X, LLC § <br> DEFENDANTS § | CIVIL ACTION NO. A-17-cv-1088 |

## PLAINTIFFS MARK F. SCHULTZ AND LANDMARK CONSOLIDATED, INC'S ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

NOW COME PLAINTIFFS, Mark F. Schultz and Landmark Consolidated, Inc. (collectively hereafter "Plaintiffs") and file this their original complaint against John Acker, individually (hereinafter "Acker" or "Mr. Acker"), and Miracle Strip Holdings X, LLC. (collectively, hereinafter "Defendants"), and in support thereof would show the Court as follows:

I. PARTIES

1. Plaintiff Mark F. Schultz is an individual residing in Austin, Travis County, Texas.

2. Plaintiff Landmark Consolidated, Inc. is a corporation organized under the laws of the State of Texas and residing with its principal office in Austin, Travis County, TX.

3. Defendant John Acker is an individual residing in the state of Florida whose address is 3293 Burnt Pine Ln., Miramar Beach, Florida.

4. Defendant Miracle Strip Holdings X, LLC (hereinafter referred to as "MSH") is a limited liability company organized under the laws of the State of Florida. This defendant can be

1

served by serving its registered agent, Michael Kayusa, 2077 First Street, Suite 201, Fort Myers, Florida 33901.

## II.   JURISDICTION

5. This court has original jurisdiction over this proceeding pursuant to 28 U.S.C. §1332(a) because the amount in controversy in this action exceeds $75,000.00 and the parties are residents of different states.  Specifically, in addition to the allegations in paragraph 4 above, the members and managing member of MSH reside in the State of Florida.

## III.   VENUE

6. Venue is proper in this division of this district under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district.

## IV.   CONDITIONS PRECEDENT

7. All Conditions precedent have been performed or have occurred.

## V.   FACTS

8. On or about the period February 15, 2017 and February 21, 2017- Mark Schultz was contacted through several texts and a phone call by Desi Arellano who proposed joint investments between his family and Mark. Schultz.

9. Mr. Arellano owns a concrete finishing company that Mr. Schultz engaged in construction in the past and Mr. Schultz had hired Mr. Arellano in 2008 for a brief time when Mr. Arellano fell on hard times and Mr. Schultz was trying to help him financially.  Mr. Arellano encouraged Mr. Schultz to meet Mr. John Acker on a phone call because, he represented, Mr. Acker, who was his step son-in-law, was the "real deal" and "a genius" in the investment world

and he thought there was a high likelihood that Mr. Schultz and Mr. Acker could team up on investment opportunities in the real estate sector (Mr. Schultz's core business).

10. Wednesday, February 22, 2017 Desi Arellano and John Acker, together, called Mr. Schultz and introduced Mr. Acker as an investor and investment banker to Mr. Schultz for the first time. Mr. Acker touted his own career accomplishment on this phone call which he claimed to include, amongst other things, being Wayne Rogers' (the former actor turned investment advisor and conservative pundit) right-hand man for 20 years (until Mr. Rogers' death) and being a former partner with Gabriel Silverstein.

11. Between March 9, 2017 and March 13, 2017, Desi Arellano attempted three times to schedule a follow up phone call with he, Mr. Acker and Mr. Schultz but Mr. Schultz informed Mr. Arellano that he was not available on the dates and times that these proposed calls were scheduled

12. Wednesday, March 28, 2017, Jeff Lehman (who was represented by Mr. Arellano, Mr. Acker and Mr. Lehman to be Mr. Acker's "right-hand man") contacted Mr. Schultz by text to schedule a conference call with he, Mr. Acker, Mr. Arellano, Mr. Schultz and Greg Aclin (the General Legal Counsel for Medistar Corporation owned by Monzer Hourani). This call did take place and was chaired by Mr. Acker. The purpose of the call was to discuss ways that John Acker, Medistar and Landmark Consolidated (Mr. Schultz's operating company) could work together on real estate investment opportunities.

13. Effective March 30, 2017 at the behest of Acker, Jeffery Lehman on behalf of Miracle Strip Holdings X, LLC and Mark Schultz on behalf of himself and Landmark Consolidated, Inc., entered into a Confidentiality and Non-Circumvention Agreement in support of their business ventures.

14. On or about April 11, 2017, Acker called Mark Schultz and represented to him by telephone that Acker had an incredible investment opportunity and that he wanted to do Mark Schultz a favor and let him be part of it. Acker told Mark Schultz that he wanted each of them to invest $20,000 with his friend in Chicago and that the investment would quadruple their money in 25 days. Acker represented to Mark Schultz that he had invested with his friend ("James") more than 40 times previously over the years and made well over 7 million dollars in profit by doing so. Acker represented to Mark Schultz that Acker had $900,000.00 liquid in the bank and could do the deal himself but Acker said that he wanted Mark Schultz to become his business partner and offered this investment, which he personally guaranteed, as a good faith gift to kick off the partnership.

15. Wednesday, April 12, 2017 Mr. Acker traveled to Austin and met with Mr. Schultz at the restaurant at the Four Seasons Hotel in Austin, Travis County Texas. This was Mr. Acker and Mr. Schultz's first in-person meeting. Mr. Acker represented that the investment opportunity in Paragraph 14 had become a much bigger and better opportunity for two investments. Acker represented that because he was personally guaranteeing Mark Schultz' investment profits and the return of principal in the total amount of $690,500.00, Mark Schultz did not need to be a party to investment agreements. Acker's primary purpose of coming to Austin and meeting with Mr. Schultz was to solicit $108,000 from Mr. Schultz for those short-term investments for "James'" company in Chicago.

16. On April 12, 2017, at the aforementioned meeting in Austin, Texas at Mr. Acker's request and relying on the promises in Paragraph 15, Mr. Schultz handed Mr. Acker a $70,000.00 personal check payable to John Acker as the first part of the $108,000 solicitation in paragraph 15 above which investment was for a term of 20 days.

17. On April 14, 2017, the $38,000.00 remainder of the $108,000 that Mr. Acker solicited for the second investment with a term of 25 days was wire transferred from Mr. Schultz's personal bank account in Austin, Texas to Mr. Acker's personal bank account in Florida.

18.  The primary reason Mr. Schultz made these investments in paragraph 16 and 17 was that Mr. Acker personally guaranteed the $108,000 investment in Paragraphs 15-17 to Mr. Schultz.

19. Wednesday, April 19, 2017, Mr. Acker telephoned Mr. Schultz and told Mr. Schultz that he and Mr. Schultz needed to immediately deposit a total of $150,000 in earnest money to get an independent living facility named "Residences at Bluewater Bay" in Niceville, FL under contract that was a very lucrative investment opportunity.  Mr. Acker told Mr. Schultz on this call that he would deposit $75,000 of his own money for half the earnest money if Mr. Schultz would invest $75,000 for the other half of the earnest money.

20. Mr. Acker told Mr. Schultz that Mr. Schultz's invested money in the investment referenced in Paragraph 19 would be held in trust by Florida attorneys Anchors Smith Grimsley ("ASG") until it was deposited as earnest money. Mr. Acker also promised Mr. Schultz that Mr. Schultz would have joint control of this earnest money once it was deposited with the title company and in no event would the earnest money be allowed become nonrefundable or be at risk of being forfeited without Mr. Schultz's approval of such.

21. On April 19, 2017, relying on the representations in paragraphs 19-20 above, Mr. Schultz wire transferred the requested $75,000 from Mr. Schultz's personal bank account in Austin, Texas to Mr. Acker's personal bank account in Florida same day and entrusted Mr. Acker with this money.

22. Mr. Acker never invested any money towards the earnest money in Paragraphs 19 and 20, did not deposit the funds into a trust account, and blatantly stole the $75,000 Mark Schultz invested with and entrusted in him for his own personal use. Simply, these projects never went under contract and this was just a scam that Mr. Acker perpetrated on Mr. Schultz to steal $75,000 from Mr. Schultz.

23. On April 25, 2017 Mr. Acker traveled to Austin, Texas again and met in-person with Mr. Schultz at the restaurant at the Four Seasons Hotel. Mr. Acker's sole purpose of meeting with Mr. Schultz was to request that Mr. Schultz immediately invest $100,000 for 50% of the required $200,000 in earnest money for the purchase of two Hicks Ventures rehabilitation facilities in El Paso, TX and Fargo, ND under contract which he again touted as being a very lucrative investment opportunity. Mr. Acker said he would deposit $100,000 of his own money for half the earnest money if Mr. Schultz would invest $100,000 for the other half of the earnest money.

24. On April 25, 2017 Mr. Acker told Mr. Schultz that the monies invested by Mr. Schultz pursuant to paragraph 23 above would be held in trust by ASG until it was deposited as earnest money. This was believable because Mr. Acker had represented to Mr. Schultz that ASG was representing Acker, Mr. Schultz and Landmark Consolidated for this transaction. Mr. Acker also promised Mr. Schultz that Mr. Schultz would have joint control of this earnest money once it was deposited with the title company and in no event would the earnest money be allowed to become nonrefundable or be at risk of being forfeited without Mr. Schultz's approval of such.

25. On April 26, 2017, based on the representations in paragraphs 23 and 24 above, Mr. Schultz wire transferred this $100,000 towards the earnest money from his personal bank account in Austin, Texas to Mr. Acker's personal bank account in Florida.

26.  Mr. Acker never deposited Mr. Schultz's $100,000 (or his own $100,000) in earnest money into a trust account and instead outright stole this $100,000 from Mr. Schultz.

27. On Monday, May 1, 2017 Mr. Acker telephoned Mr. Schultz and told him he and Mr. Schultz needed to immediately deposit a total of $300,000 in earnest money to get four memory care facilities in Niceville, Lecanto, Cala Hills, and Brandon Florida owned by Superior Residences, Inc. under contract which real estate investments were very lucrative investment opportunities.  Mr. Acker promised he would deposit $150,000 of his own money for half the earnest money if Mr. Schultz would invest $150,000 for the other half of the earnest money.

28. On May 1, 2017, Mr. Acker expressly told Mr. Schultz that Mr. Schultz's invested  monies, in accordance with Paragraph 27 above, would be held in trust by ASG until it was deposited as earnest money. Mr. Acker again promised Mr. Schultz that Schultz would have joint control of this earnest money once it was deposited with the title company and in no event would the earnest money become nonrefundable or be at risk of being forfeited without Mr. Schultz's approval of such.

29. On May 1, 2017, relying on the representations in paragraphs 27 and 28 above, Mr. Schultz wire transferred $150,000 towards the earnest money from his personal bank in Austin Texas to Acker's account in Florida.  Mr. Acker never deposited Mr. Schultz's $150,000 (or his $150,000) as earnest money and instead outright stole this money from Mr. Schultz.

30. On or about May 1, 2017, Acker executed a Letter of Intent to enter into a purchase contract with the owner regarding the property referenced in Paragraphs 23 through 26

on behalf of himself, MSH, Mark Schultz, and Landmark Consolidated, Inc. for two properties in El Paso, Texas and Fargo, North Dakota (hereinafter the "LOI").

31. On or about May 2, 2017, Mark Schultz contacted Jeff Lehman, acknowledged the LOI and requested that he "provide me everything that you have on the three contracts for which this earnest monies were deposited (i.e. copies of receipted contracts, dates the earnest money was deposited, dates the earnest money goes hard, etc.)" which information was never provided by Acker or his right-hand man. Acker later concocted another story and told Mr. Schultz that these acquisitions ended up requiring more earnest money (a total of $1,160,000) and that he personally put up an extra $900,000 of this amount. This was another blatant lie.

32. On or about May 11, 2017, Acker met with Mark Schultz in Austin, Texas, failed to provide the specific information requested in Paragraph 31 but delivered a "promissory note" that he had signed and which purported to reflect a $325,000.00 no interest loan for 90 days from Mark Schultz to Acker which was never discussed with, agreed to, nor signed by Mark Schultz.

33. When the promised payments in Paragraphs 15-17, were not made to Mr. Schultz by May 17, 2017, Mr. Schultz' requested the full name and contact information for "James" from Paragraphs 14 and 15.

34. Despite repeated requests from Mr. Schultz, Mr. Acker has failed to provide Mr. Schultz with the full name and contact info for this "James" referenced in Paragraphs 14, 15, and 33.

35. On information and belief, "James" was a fiction created by Mr. Acker to be used in his scam to steal $108,000 from Mr. Schultz and Mr. Acker blatantly stole the money in paragraphs 15-18, and 33 from Mr. Schultz and never invested any portion of it in any investment.

36. On or about June 15, 2017, having received no specific information regarding the investments or evidence of them, Mark Schultz demanded return of all the $433,000.00 that had been delivered to John Acker and forwarded wiring instructions.

37. During the fifty days prior to June 26, 2017, on nine occasions Acker represented to Mark Schultz by text and telephone calls that payment would be made by wire transfer to Austin, Texas on the $108,000.00 investment with "James" in ever increasing amounts until, on or about June 26, 2017, Acker responded to Mark Schultz' demand by telling him that, because of the missed deadlines, "James" had increased the return to Mark Schultz on the original $108,000.00 investment in Paragraph 14 and 15 to $1,108,000.00 which Akers guaranteed would be wired to Mark Schultz' account in Austin, Texas which transfer would come from his attorney Don Anchors office that day.

38. In response to the representations described in paragraph 37 above by Acker, Mark Schultz told Acker that if the promised payment of $1,108,000.00 were made on Monday, June 19, 2017, the immediate return of the remaining $325,000.00 in earnest money would not be necessary.

39. The payment referenced in paragraphs 37 and 38 were never made to Mr. Schultz.

40. On or about June 26, 2017, Acker cancelled a telephone conference with Mark Schultz and his attorney that he had set up and said that he was meeting with his attorney and they would have a conference call from that office which did not occur.

41. On or about June 27, 2017, Mark Schultz' attorney spoke with Ackers' attorney Don Anchors who told her that Ackers had no money and, that same day, Ackers scheduled a telephone meeting with Mark Schultz for 10:00 A.M. the following day to "resolve."

9

42. On or about June 28, 2017 Acker confirmed the conference call to include himself, his accountant and "others" with Mark Schultz and his attorney for 10:00 A.M. that day.

43. On June 28, 2017 Acker did not appear for the conference call, instead his accountant Judd S. Jackson spoke with Mark Schultz' counsel. After being told that any further discussion would not be allowed unless the documents executed following the LOI were provided, Mr. Jackson provided draft purchase and sale agreements for the El Paso and Fargo facilities and a draft assignment and purchase agreement for both for the investments referenced in paragraphs 25-27 above, all of which documents omitted any mention of Mark Schultz or Landmark Consolidated, Inc. and were for the benefit of MSH only.

44. During the period between June 28, 2017 and July 7, 2017, at the urging of Acker and his representatives, Mark Schultz, Landmark Consolidated, Inc., John Acker and MSH negotiated a conditional settlement agreement. A Conditional Settlement Agreement, Mutual Release and Non-Disparage Agreement (hereinafter referred to as "the Conditional Agreement") was executed by the parties on July 8, 2017.

45. As a material predicate to the Conditional Agreement, Acker and MSH made a covenant that they or their agents had already disclosed to all related parties that Landmark Consolidated, Inc., rather than MSH, will be the party to the purchase and sale agreements and assignment referenced in Paragraphs 23, 24, 25, and 26 for the Fargo, ND and El Paso, Texas facilities and the parties to each document had agreed to the action. Under the Conditional Agreement, failure to do this is a material breach for which Mark Schultz and Landmark Consolidated may sue for breach of the Conditional Agreement.

46. Despite Plaintiffs' compliance with the Conditional Agreement, subsequent to the execution of the Conditional Agreement, Acker disclosed that the related parties referenced in Paragraph 44 had not agreed to the action in Paragraph 45.

47. As further consideration for the Conditional Agreement, Acker and MSH promised that simultaneously with the execution of the Conditional Agreement, MSH and Acker shall substitute Landmark Organization on the execution documents for the El Paso, Texas and Fargo, ND facilities referenced in Paragraph 45.

48. Despite Plaintiffs' compliance with the Conditional Agreement, Acker and MSH failed and refused to perform the promise in Paragraph 47.

49. As consideration for the Conditional Agreement, Acker and MSH promised that they shall immediately provide introduction of Mark Schultz to all the parties to all the agreements referenced in Paragraph 45.

50. Despite Plaintiffs' compliance with the Conditional Agreement, Acker and MSH failed and refused to perform the promise in Paragraph 49 and materially breached the Conditional Agreement.

51. As part of the consideration for the Conditional Agreement, Acker and MSH agreed to payment of $5,000.00 to Mark Schultz beginning July 17, 2017 and on the same day each month until the monetary consideration of the Conditional Agreement in the amount of $866,000.00 has been satisfied.

52. Under the terms of the Conditional Agreement, failure to pay any monthly payment is a material breach.

53. While the initial $5,000.00 payment was made and sent July 19, 2017, Acker and MSH have failed and refused to make any further payment as required by the Conditional Agreement.

54. Acker and MSH have failed and refused to perform the covenants, promises and obligations of the Conditional Agreement.  By misrepresenting their actions prior to the document and refusal to perform any obligations of the document, it is evident that the Conditional Agreement was negotiated in bad faith for the purpose of delaying Plaintiffs pursuing legal remedies.

## VI. CAUSES OF ACTION

<u>Fraud: Common Law and Fraudulent Misrepresentation</u>

55. Plaintiff incorporates Paragraphs 8 through 43 herein as if set forth verbatim.

56. Defendant Acker individually and acting through Miracle Strip Holdings X, LLC represented that he would invest $108,000.00 of his money and $108,000.00 to be provided by Plaintiffs with a proven friend with whom Acker had invested more than 40 times and previously made well over 7 million dollars in profit.  Further Defendant represented that he personally guaranteed profit and return of investment in the amount of $690,500.00.

57. Defendant Acker individually and acting through Miracle Strip Holdings X, LLC represented to Defendants that they were entering into certain real estate investments as joint ventures with each putting up one-half the earnest money.  In connection with solicitations for Residences at Bluewater Bay, Hicks Ventures rehabilitation facilities in El Paso Texas and Fargo North Dakota, and four memory care facilities in Florida, Defendants represented that the transactions depended on the immediate receipt of the money, the money was necessary earnest money, Defendants were putting up one half of the earnest money, the money would be held in

trust by Defendants' attorney until turned over to a title company, that Plaintiffs would have joint control of the earnest money, and that in no event would the earnest money become nonrefundable or be at risk of being forfeited without Plaintiffs' approval.

58. The representations in paragraphs 55 through 57 were material because Plaintiffs would not have provided the solicited money without the representations.

59. The representations in Paragraphs 8 through 44, 55, 56 and 57 were false.

60. At the time the representations in Paragraphs 8 through 44, 55 56 and 57 were made, Defendants knew the representations were false or made the representations recklessly, as a positive assertion and without knowledge of their truth.

61. Defendants made the representations with the intent that Plaintiffs act on them and entice an advance of money to Defendants in the amount of $433,000.00.

62. Plaintiffs relied on the representations of Defendants as Plaintiffs were ignorant of the facts and the Plaintiffs did not have an equal opportunity to discover the facts because of the urgency of the solicitations.

63. Plaintiffs were injured as a result of acting on the representations of Defendant general damages in the minimum amount of $433,000.00

64. The wrong done by Defendants was aggravated by the kind of fraud for which the law allows the imposition of exemplary damages, in that Defendants knowingly misrepresented material facts with the intent that the representations be acted upon by Plaintiff. Plaintiff, therefore, seek exemplary damages in the minimum amount of $866,000.00.

Breach of Fiduciary Duty

65. Plaintiff incorporates Paragraphs 8 through 43 herein as if set forth verbatim.

66. Defendants initiated a relationship with Plaintiff on a personal basis.  The initial "guaranteed" investment was to be given because Defendants wanted Plaintiffs to be investment partners and engendering a high level of confidence in the reputation of Defendant and trust in his taking the lead.

67. The following three solicitations were for Plaintiffs to be partners in investments and business ventures in which Defendants represented that equal amounts were to be contributed by both parties, there is a common business focus and both parties have control over the investment.

68. The business and personal relationship in paragraphs 8 through 44, 64 and 65 created a fiduciary relationship wherein Plaintiffs relied on Defendants' expertise and advice as a trusted advisor and partner; consequently, Defendants were, in equity and good conscience, bound to act in good faith and with due regard for the interest of Plaintiffs.

69.  Defendants breached their fiduciary duty to Plaintiff by failing to make full disclosure of all matters, failing to remain loyal to the joint concern, and, failure to exercise the utmost good faith, fairness and honesty in dealing with Plaintiffs.

70. Plaintiff has suffered injury in the loss of $433,000.00 entrusted to Defendants as actual damages.

71. Because Plaintiffs were injured due to the fraud, malice and gross negligence of Defendants, Plaintiffs are entitled to exemplary damages in at least the amount of $846,000.00.

Breach of Contract

72. Plaintiffs incorporate by reference Paragraphs 8 through 43 herein as if set forth verbatim.

73. Defendants promised to guarantee the initial $108,000.00 profit and investment, and promised that the remaining $325,000.00 solicited would be held in trust as escrow funds for investment property which would not be put at risk until and unless Plaintiffs granted permission.  Further, Defendants promised that Defendants were making the same contributions simultaneously with Plaintiffs' payment and that both parties would have control over the investments.

74. Plaintiffs fully performed as promised by tendering a total of $433,000.00 in investment funds for the five investments.

75. Defendants materially breached the contract by failing and refusing to guarantee of the funds in Paragraph 72 and by failing to place the other in trust or escrow and by refusing to return the funds after request.

76. Defendants' breach caused injury to Plaintiffs which resulted in the following damages: general damages, lost profits and loss of the benefit of the bargain; in the minimum amount of $ 1,015,500.00.

<u>Breach of Conditional Settlement Agreement, Mutual Release and Non-Disparagement Agreement</u>

77. Plaintiffs incorporate by reference Paragraphs 44 through 54 herein as if set forth verbatim.

78. Defendants entered into the Conditional Agreement covenanting that actions had been taken that would be necessary for defendants to be in a position to comply with the promises required upon execution of the agreement.  Further, Defendants committed to make minimum monthly payments until the full amount of the monetary payment was made, among other conditions.

79. While Plaintiffs complied with the agreement, Defendants intentionally misrepresented the factual covenants to the agreement and breached the agreement.

80. By the terms of the agreement and under the law, the breaches are material.

81. By the terms of the agreement, Plaintiffs were to receive compensation for their damages in the amount of $866,000.00 which are their contract damages for breach of the agreement.

## VII.   DAMAGES

82. Plaintiffs are entitled to actual damages pursuant to Paragraphs 63 and 70 in, at least, the amount of $433,000.00

83. Plaintiffs are entitled to exemplary damages pursuant to paragraphs 64 and 71 in, at least, the amount of $866,000.00.

84. Plaintiffs are entitled to damages for breach of contract pursuant to Paragraph 76 in, at least, the amount of $1,015,500.00.

85. Plaintiffs are entitled to damages for breach of The Conditional Agreement pursuant to Paragraph 81 in the amount of $866,000.00

## VIII.   ATTORNEYS FEES AND COSTS.

86. Plaintiffs are entitled to reasonable and necessary attorney fees pursuant to Paragraphs 72 through 81 as authorized by Texas Civil Practices and Remedies Code, Article 38.001.

87. Plaintiffs are entitled to costs of court.

## IX. JURY DEMAND

Plaintiffs demand trial by jury.

X.  PRAYER

WHEREFORE, Plaintiffs pray that Defendants be summoned to answer this Complaint, that the case be tried before a jury and that upon final judgment the Plaintiffs recover their damages as alleged herein, including their actual damages, exemplary damages, contract damages, and their costs and expenses of suit, including reasonable attorney fees.  Plaintiffs pray for such other relief to which they may be justly entitled.

Respectfully submitted,

By: /s/ Wanda J. Harkness
  WANDA J. HARKNESS
  State Bar No. 09010100
LAW OFFICES OF WANDA J. HARKNESS
406 Sterzing Street, 3rd floor
Austin, Texas  78704
(512) 472-7467
(512) 474-7121    (Telecopier)
wjh@lawofficeswjh.com(email)

**ATTORNEY IN CHARGE FOR PLAINTIFFS MARK F. SCHULTZ and LANDMARK CONSOLIDATED, INC.**